UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DORIS F. JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV597 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Doris Johnson's application for benefits under the Social Security Act. Johnson

applied for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401,

*et seq.* She also applied for supplemental security income benefits under Title XVI

of the Act, 42 U.S.C. §§ 1381, *et seq.* Section 205(g) of the Act, 42 U.S.C. §

405(g), provides for judicial review of a final decision of the Commissioner under

Title II, and Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for

judicial review of a final decision under Title XVI.

Johnson claims she is disabled due to, among other things, a degenerative

condition in her cervical spine, thyroid-related problems, a right foot injury, and

numbness in her hands.  Johnson alleged an onset date of January 19, 2006[1] for her

disability.  Because I find the decision denying benefits to be supported by

substantial evidence, I will affirm the decision of the Commissioner.

## Procedural History

Johnson filed her applications for benefits on November 28, 2007.  Her

applications were denied on February 19, 2008, and Johnson  filed a timely written

request for a hearing.  Following a hearing, an Administrative Law Judge found on

November 25, 2009 that Johnson was not disabled.  The Appeals Council of the

Social Security Administration denied Johnson's request for review on January 28,

2011.  Therefore, the decision of the ALJ stands as the final decision of the

Commissioner.

## Evidence Before the Administrative Law Judge

### Medical Records

On January 19, 2006, Johnson visited the St. Louis County Department of

Health (SLCDH) with complaints of neck and bilateral leg pain.  A nurse

practitioner treated her for elevated blood pressure, esophageal reflux,

osteoarthritis involving an unspecified site, and hyperlipidemia.  She was

---

[1]Johnson initially provided an alleged onset date of August 1, 2003 but later amended the date to January 19, 2006.  Additionally, the ALJ found a denial of benefits by a previous administrative law judge to be *res judicata* through January 26, 2007.

instructed to follow up in three months.

Johnson returned to SLCDH on March 10, 2006 due to breast soreness. The report noted benign hypertension, esophageal reflux, hyperlipidemia, joint pain in multiple sites, and an inflamed hair follicle.

Two months later, Johnson again visited SLCDH on May 26, 2006. The report noted benign hypertension, esophageal reflux, hyperlipidemia, and joint pain in multiple sites. It also noted joint pain in the ankle and foot. The physical exam described her as otherwise normal.

Johnson next visited SLCDH on June 21, 2006 with a complaint of foot pain. She was treated for plantar fascial fibromatosis and a calcaneal spur. Three months later, she returned on September 27, 2006 for a breast exam. She stated she lost her medication after moving from her house, and she had not taken any of her medication for over a year. The treating nurse described Johnson as being in good general health, but noted benign hypertension, esophageal reflux, hyperlipidemia, ankle and foot joint pain, and limb pain. A mammogram and x-ray were also ordered.

On December 7, 2006, Johnson saw William Feldner, D.O., at SLCDH due to her right thumb catching. She described the problem as moderate. Dr. Feldner diagnosed trigger finger of the right thumb, administered an injection, and applied

a splint.

Six months later, Johnson returned to Dr. Feldner on June 21, 2007 with complaints of neck and shoulder pain. X-rays and magnetic resonance imaging (MRI) were ordered. The x-rays revealed a normal right hand but an osteoarthritic left hand. A neck x-ray revealed a reversal of the cervical curve and moderate to severe degenerative changes.

Johnson again visited SLCDH on August 16, 2007 and reported continued neck pain. A subsequent MRI on September 13, 2007 revealed moderately severe disc space degeneration and broad-based disc bulging. A September 20, 2007 follow-up with Dr. Feldner confirmed the disc degeneration. Brachial neuritis was also diagnosed. Dr. Feldner further stated that not many good options existed for the disc degeneration but a pain management evaluation would be the best course of action.

On October 8, 2007, Johnson returned to SLCDH and saw Neesha D. Kurian, M.D. Johnson reported weight gain and hot flashes. Additionally, she asked for refills of her prescriptions since her medications had run out weeks before the visit. Dr. Kurian diagnosed benign hypertension, hyperlipidemia, joint pain in multiple sites, and esophageal reflux. Johnson was instructed to see a nutritionist for obesity. A December 20, 2007 visit to an endocrinologist also

revealed hypothryoidism.

Johnson again saw Dr. Feldner on December 27, 2007 with complaints of left shoulder pain. Dr. Feldner noted a decreased range of shoulder motion and painful movements. He injected the joint with a steroid.

On January 11, 2008, Johnson saw Dr. Kurian at SLCDH for an annual gynecological examination. The report noted that Johnson felt well with minor complaints. Johnson also reported not exercising, but said she had an active lifestyle taking care of her grandson. She also reported sleeping six hours per night with some difficulty due to pain, though Tylenol provided some help. Dr. Kurian noted hyperlipidemia, benign hypertension, esophageal reflux, and shoulder pain. Upon a referral from Dr. Kurian, Johnson visited a nutritionist on January 14, 2008, who advised Johnson on ways to improve her diet. Exercise was also recommended. A few days later, she visited a podiatrist at SLCDH due to a severe bunion.

Johnson visited Barnes Jewish Pain Management Clinic on February 19, 2008 for neck pain and intermittent shoulder, low back, hip, thigh, knee and calve pain. Jeremy Scarlett, M.D., reported that Johnson did not wish to have surgery but would consider neck injections. He also noted normal strength throughout and benign obesity. Dr. Scarlett diagnosed Johnson with chronic pain, cervical

spondylosis without myelopathy, fibromyalgia, and unspecified insomnia. He prescribed lyrica for fibromyalgia and physical therapy. He also ordered a follow-up in two weeks for a cervical epidural steroid injection.

On February 29, 2008, Johnson returned to SLCDH for a follow-up visit for hyperlipidemia. The exam noted full range of motion in all joints, normal overall strength, and normal joints and muscles. Benign hypertension was noted, as well as hyperlipidemia and postmenopausal bleeding. Johnson was also urged to improve her diet. Six days later, Johnson underwent a colonoscopy. This exam revealed a normal colon with the exception of very minute polyps, which were removed during the procedure. The report also described Johnson as a normal healthy patient with a pain level of zero on a 0/10 scale.

Johnson next visited SLCDH on March 12, 2008. Following a complaint of blurred vision, glasses were prescribed for astigmatism. She returned on March 17, 2008 due to postmenopausal bleeding. A biopsy of the uterus lining was ordered. Upon receiving the results of this biopsy, medication was prescribed on March 31, 2008.

On May 30, 2008, Johnson returned to SLCDH for a follow-up examination and medication refills. The nurse noted benign hypertension, hyperlipidemia, and esophageal reflux. Prescriptions were refilled for these conditions.

Johnson next visited Dr. Feldner on June 26, 2008 due to moderate right shoulder pain. He noted decreased range of motion and painful movements. He diagnosed bicipital tenosynovitis and prescribed ice, rest, and exercises. When told that Johnson had filed for disability, Dr. Feldner noted that Johnson had shoulder pain, but he did not feel she had any disability.

Approximately eight months later, Johnson returned to SLCDH on February 3, 2009 with a complaint of hypertension. Prescriptions were refilled for benign hypertension, hyperlipidemia, esophageal reflux, acute sinusitis, and bicipital tenosynovitis. As previously directed, Johnson was also instructed to follow-up with a gynecologist due to her postmenopausal bleeding.

On February 17, 2009, Johnson visited a gynecologist at SLCDH. She underwent a routine gynecological exam. Johnson stated she had no complaints this visit. The physician ordered a pelvic ultrasound. The report also noted that Johnson had been noncompliant with medication. Johnson returned to SLCDH on June 11, 2009 due to postmenopausal bleeding. The report again noted noncompliance with medication.

Johnson next visited SLCDH on August 20, 2009 with complaints of left wrist and thumb pain. Dr. Feldner diagnosed radial styloid tenosynovitis and left thumb trigger finger. Splinting and medication were ordered.

<u>Testimony Before the ALJ</u>

*Johnson's Testimony*

At the September 16, 2009 administrative hearing, Johnson testified she was 55 years old with a general equivalency degree. Johnson stated she lived with her sister and brother, who both received disability benefits. She stated she was five feet tall and weighed 191 pounds, and she received Medicaid and food stamps.

Johnson testified that her last job was at a secondhand store, which fired her for not testing a microwave prior to selling it. She also stated she had previously worked as a sales clerk, but she could not currently perform such a job as she needed to have her feet elevated throughout the day since elevating her feet reduced her ankle swelling. Johnson stated she was "supposed to have operations" on her feet, but she "cannot let them cut" on her. She relayed a fear of surgery based on the surgical outcomes of two cousins.

Johnson further testified that pain in her neck made any movement painful. She stated even combing her hair, opening a milk bottle, or bending over to get a shoe resulted in pain. Johnson said she could only stand for about ten to fifteen minutes before needing to sit, and she could only sit for fifteen minutes. Moreover, she surrounds herself with pillows when seated.

Johnson also alerted the ALJ to further pain from fibromyalgia and

degenerative arthritis. She stated these conditions caused her pain in other areas of her body, such as her shin and feet. She stated that doctors had wanted to perform surgery on her neck, but she refused the procedure since they couldn't "guarantee it's going to be well." Johnson stated the pain in her neck is dull and deep, and even sore to the touch.

Johnson said her sister mostly cooks for her, but she washes her own plate and utensils. She also washes herself and does her own laundry. However, her sister does most other household chores such as dusting, vacuuming, and shopping. Additionally, she stated she does not have a driver's license and has not driven a car since 2003.

Lastly, Johnson stated that she cannot write more than seven minutes consecutively due to cramping or numbness in her hand.

*Vocational Expert's Testimony*

The ALJ received additional testimony from John A. Granfeld, a vocational expert. When asked to describe Johnson's previous work, Dr. Granfeld testified that she was previously a sales attendant, a sorter, a housekeeper, and a medical records clerk. He respectively classified these jobs as light and unskilled, light with an SVP of 2 (unskilled), light with an SVP of 2, and sedentary with an SVP of 4 (semi-skilled).

Johnson later clarified her duties as a medical records clerk. She stated she never sat during her work at the medical clinic, but her duties instead entailed gathering and delivering folders to doctors' offices. Dr. Grenfeld found this description to be consistent with a messenger instead of a medical records clerk. He stated this would be classified as light work with an SVP of 2. However, Dr. Grenfeld also stated this job is not listed in the Dictionary of Titles.

## Legal Standard

A court determines on review whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009). Substantial evidence is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.* When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion. *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005). This standard of review requires consideration of evidence supporting the Commissioner's decision as well as evidence detracting from it. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009). However, if the evidence allows for two inconsistent positions, and one of these positions represents the ALJ's findings, the court must affirm the ALJ's decision. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).

To determine whether substantial evidence supports the decision, the Court must review the administrative record as a whole and consider:

> (1) the credibility findings made by the ALJ;
> (2) the education, background, work history, and age of the claimant;
> (3) the medical evidence from treating and consulting physicians;
> (4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
> (5) any corroboration by third parties of the plaintiff's impairments; and
> (6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health and Human Serv.*, 957 F.2d 581, 585-86 (8th Cir. 1992).

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not

disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work. If the claimant can perform past relevant work, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether she can perform other work in the national economy. If not, the claimant is declared disabled. 20 C.F.R. § 404.1520; § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). However, the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). When considering subjective complaints, the ALJ must consider the factors set out in *Polaski v.*

*Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions.

*Id.*; *see also Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

## **The ALJ's Findings**

Based on all the evidence, the ALJ found Johnson was not disabled from January 19, 2006 through the date of the decision. Specifically, the ALJ made the following determinations:

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2007.

2. The claimant had not engaged in substantial gainful activity since January 19, 2006, the alleged onset date.

3. The claimant had the severe impairments of degenerative disc disease of the cervical spine and left trigger thumb.

4. The claimant did not have an impairment that met or medically equaled a listed impairment in Appendix 1. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

5. The claimant had a residual functional capacity (RFC) to perform the full range of light work defined in 20 C.F.R. § 404.1567(b) and § 416.967(b).

6. The claimant was capable of performing past relevant work as a medical records clerk, sales attendant, sorter, and housekeeper. This work did not require the performance of work-related activities

precluded by the claimant's RFC.  20 C.F.R. § 404.1565; § 416.965.

7.    The claimant has not been under a disability, as defined by the Social
      Security Act, from January 19, 2006 through the date the decision.

The ALJ noted that a physician at Barnes Jewish Pain Management Clinic had diagnosed Johnson with fibromyalgia in February of 2008, "although there was no report of positive trigger points."  The ALJ stated that little objective evidence in the record supported this diagnosis, and it appeared "to have been made on the claimant's subjective complaints only."  He noted there was no medical evidence of loss of strength in any extremity or any trigger point tenderness.

In further assessing Johnson's subjective pain complaints, the ALJ did not find them credible. After considering the objective medical evidence, the ALJ found the medically determined impairments could cause the alleged symptoms, but the persistence or limiting effects of the symptoms "are not credible to the extent they are inconsistent with the above" RFC.  The ALJ noted that Johnson performed many normal activities of life such as shopping, some household chores, and taking care of herself.  He also noted her unimpressive work record and a significant motivation to seek benefits.  The ALJ further noted Johnson's refusal of surgery for her cervical problems.

<u>**Discussion**</u>

Johnson's contentions can be consolidated into three principal arguments. First, Johnson argues the ALJ failed to consider required credibility factors when assessing Johnson's subjective complaints of pain. Second, Johnson argues the ALJ improperly determined Johnson's severe impairments due to his findings on Johnson's fibromyalgia. Lastly, Johnson argues the ALJ made an improper RFC determination by failing to consider Johnson's obesity, mental health issues, and sensitivity to vibrations and extreme cold.

<u>Subjective complaints of pain</u>

Since evidence of pain is subjective in nature, an ALJ "cannot simply reject complaints of pain because they were not supported by objective medical evidence." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). Instead, the ALJ is required to consider all evidence relating to the complaints. *Id.* Under the framework set forth in *Polaski*, an ALJ must consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Buckner*, 646 F.3d at 558. An ALJ is not required to explicitly discuss each

*Polaski* factor. *Id.* Further, an ALJ cannot discount a claimant's allegations of pain based solely on a lack of objective medical evidence to support them, but may find a lack of credibility based on inconsistencies in the evidence as a whole. *Id.* The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore*, 572 F.3d at 525 (quoting *Holmostrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner*, 646 F.3d at 558.

The ALJ found that Johnson's medically determinable impairments could have reasonably caused her described symptoms, but the intensity, persistence and limiting effects of the symptoms were not credible. It is true that the ALJ did not discuss every one of the *Polaski* factors, and he did not cite to *Polaski*. Contrary to Johnson's argument, though, the ALJ was not required to discuss every factor. Also, a failure to explicitly cite to *Polaski* is not alone grounds for remand if the ALJ adequately considers some of the required factors. *See Buckner*, 646 F.3d at 558 (affirming an ALJ's credibility determination despite no citation to *Polaski* since the ALJ still discussed four *Polaski* factors).

In fact, the ALJ did discuss the following four *Polaski* factors: Johnson's daily activities; her work history; the lack of objective medical evidence to support

her complaints; and the duration, intensity, and frequency of pain. Regarding Johnson's daily activities, the ALJ found she was able to perform many normal activities, including some household chores and taking care of herself. In discussing her work history, the ALJ found Johnson's work record less than impressive, and said she appeared to have a motivation to seek benefits. *See Buckner*, 646 F.3d at 558 (upholding the ALJ's credibility determination based in part on the ALJ's finding that a sporadic work history indicated claimant "was not strongly motivated to engage in meaningful productive activity"). He further noted that an award of disability would likely result in greater income than Johnson earned in most years by working. Considering the objective medical evidence, the ALJ found that Johnson's impairments could reasonably cause her symptoms, but the symptoms were not credible concerning the intensity, persistence and limiting effects of the symptoms. The ALJ also considered fibromyalgia as a cause of the frequency and duration of Johnson's subjective pain, but ruled it out based on an examination of the medical record as a whole.

Further review of the entire administrative record lends additional support the ALJ's findings. Although Johnson did state she spent most of her time watching television and reading, she also performed some daily activities such as washing her own dishes, bathing herself, and doing her own laundry. Additionally,

during a 2008 examination by Dr. Kurian she stated she had an active lifestyle chasing after her grandson. Moreover, during many of the medical examinations during the relevant time period she offered no complaints of pain. Other medical records described her pain as localized to a certain area, and still others state that she was in good general health. *See Johnson v. Astrue*, 628 F.3d 991, 995-97 (8th Cir. 2011) (finding physican reports such as "no joint swelling," "no other complaints," and "doing well" to be inconsistent with the levels of pain and fatigue described at the hearing). Johnson also stated she had to elevate her feet throughout the day, but no physician ordered this recommendation. *See Moore*, 572 F.3d at 525 (finding self-imposed limitations not undertaken at the direction of any physician to be inconsistent with a disability claim). In fact, when Dr. Feldner, one of Johnson's treating physicians, discovered Johnson intended to apply for disability, he remarked that Johnson had some shoulder pain but no disability.

In addition to discussing these four *Polaski* factors, the ALJ further found that Johnson refused to have surgery to correct her cervical problems. The record confirms this, and it also indicates Johnson did not take her medication for over a year and never received recommended physical therapy. Such a failure to follow a recommended course of treatment lends further support to a finding of lack of credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

A review of the entire administrative record reveals inconsistencies between Johnson's allegations of pain and the evidence as a whole. Johnson certainly had pain, as was acknowledged by the ALJ, but the inconsistencies in the record support the ALJ's finding that Johnson's subjective complaints were not credible. Consequently, Johnson's first argument fails.

Johnson's possible fibromyalgia

Johnson also argues the ALJ erred by reaching a medical conclusion that Johnson did not have fibromyalgia. In discussing Johnson's possible fibromyalgia, the ALJ acknowledged she had been diagnosed with the disease. However, the ALJ found little objective evidence in the record supported the diagnosis, and that the diagnosis appeared to have been based on Johnson's subjective complaints. An examination of the record as a whole supports this finding.

The Eighth Circuit has "long recognized that fibromyalgia has the potential to be disabling." *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004). Diagnosis of fibromyalgia can be elusive due to the subjective nature of the symptoms. *Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009). Such symptoms include generalized aching, widespread tenderness of muscles, muscle stiffness, fatigue, and poor sleep. The Merck Manual 375 (19th ed. 2011).

Despite the elusive nature of the disease, techniques do exist for

fibromyalgia's diagnosis. The disease is classically diagnosed when pain exists on both sides of the body, both above and below the waist, from an axial distribution, and when point tenderness is found in at least eleven of eighteen specified tender points. Stedman's Medical Dictionary 671 (27th ed. 2000). While most experts no longer require a specific number of tender points to make the diagnosis when other sufficient symptoms are present, tenderness at specific sites typically remains part of an objective diagnosis. The Merck Manual, *supra*, at 375.

Here, Dr. Scarlett, the pain management specialist who diagnosed Johnson, noted pain sensitivity in several areas during a sensory examination. However, the record does not indicate Dr. Scarlett performed any examination of tender points. The ALJ referenced such a lack of tender point tenderness, which supports his finding that the diagnosis was based on subjective complaints. Also, despite Dr. Scarlett's diagnosis on February 19, 2008, Johnson never returned to see Dr. Scarlett. Moreover, none of Johnson's other doctors subsequently mentioned fibromyalgia, even though she visited SLCDH only ten days after Dr. Scarlett's diagnosis. During the months immediately following Dr. Scarlett's prescription of Lyrica for the disease, medical reports do reference such a prescription. However, the last reference to the drug appears during a visit on May 30, 2008, despite many medical visits following this date. Furthermore, when Johnson requested

medication refills during a February 3, 2009 visit, Lyrica was not mentioned.

"[N]ot every diagnosis of fibromyalgia warrants a finding that a claimant is disabled." *Perkins*, 648 F.3d at 900. *Compare id.* at 900-01 (upholding an ALJ's determination that fibromyalgia was not a severe impairment after a single diagnosis of the disease from a pain management specialist) *with Tilley*, 580 F.3d at 681 (holding the ALJ erred in failing to fully consider fibromyalgia when multiple doctors repeatedly diagnosed the claimant with the disease). Taken as a whole, the evidence supports the ALJ's finding that Johnson did not have the medically determinable impairment of fibromyalgia. Johnson's second point fails.

## RFC Determination

Johnson next argues the ALJ's RFC determination was not supported by substantial evidence. The RFC is the most a claimant can do despite limitations and is based on all relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(1). Here, the ALJ concluded that Johnson could perform a full range of light work. Johnson contends this determination was made in error since the ALJ failed to consider Johnson's obesity, mental health issues, and sensitivity to vibrations and extreme cold. Yet substantial evidence supports the ALJ's findings with respect to each of these issues, as will be addressed below.

*Johnson's obesity*

Johnson argues the ALJ violated Social Security Ruling 02-01p by failing to adequately consider obesity when making the RFC determination. When making such a determination, SSR 02-01p instructs an ALJ to assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Further, the "effects of obesity with other impairments may be greater than might be expected without obesity." *Id.*

A close review of the record shows only a few references to Johnson's obesity. Dr. Kurian first diagnosed Johnson with obesity on October 8, 2007, and Johnson later visited a nutritionist to discuss her diet. The February 19, 2008 exam by Dr. Scarlett also mentioned obesity, but stated it was benign. Notably, no doctor imposed any limitations on Johnson due to obesity, and Johnson did not testify that her obesity resulted in additional limitations. Consequently, the ALJ's failure to discuss Johnson's obesity was not in error. *See Forte v. Barnhart*, 377 F.3d 892, 896-97 (8th Cir. 2004) (finding no error in the ALJ's failure to discuss documented obesity since no doctor imposed any limitations, and the claimant did not testify that obesity imposed additional restrictions).

*Johnson's possible mental impairments*

Johnson also argues the ALJ failed to discuss her possible mental impairments, and that a consultative examination should have been ordered to

further explore them.  It is true that an ALJ must fully and fairly develop the record.  *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).  However, an ALJ is not obligated to investigate claims not presented in the application or offered at the hearing.  *Id.*  No bright line rule exists for determining whether the ALJ fully developed the record, but such an assessment must be made on a case-by-case basis.  *Id.*

Reviewing the record, scant evidence existed suggesting Johnson suffered from any mental impairments.  One 2005 exam mentioned depression, but this exam occurred prior to the alleged onset date.  Another exam mentioned post-traumatic memory problems, but Johnson never received any treatment for this, and it was never mentioned again.  Also, Johnson never mentioned any mental impairments in her application or in her testimony.  *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003) (finding mere prescription of antidepressants insufficient "to require the ALJ to inquire further" when claimant failed to mention depression in his application and testimony).  Therefore, the ALJ did not need to further develop the record by ordering a consultative examination.

*Sensitivity to vibrations and extreme cold*

Johnson lastly contends the ALJ failed to include a limitation against vibration or extreme temperatures, which she claims would affect her ability to

perform her prior work.  Johnson cites to a Physical Residual Functional Capacity Assessment completed by a state agency evaluator, Donald Pfleger, in support of this contention.

Social Security Ruling 96-6p states that an ALJ should not ignore medical opinions derived from state agency evaluations.  Medical opinions consist of "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of an individual's impairment(s)."  *Id.*  For a person to be an acceptable medical source, they must be a licensed physician, licensed psychologist, licensed optometrist, licensed podiatrist, or qualified speech pathologist.  20 C.F.R. § 404.1513.

Here, there is no evidence that Pfleger, the author of the assessment, possessed any credentials that would make him an acceptable medical source.  His name appears under medical consultant, but no initials follow his name whichwould indicate medical qualifications.  In such a situation, it would be wrong for an ALJ to treat this assessment as a medical opinion.  *See Dewey v. Astrue*, 509 F.3d 447, 449 (8th Cir. 2007) (holding that an ALJ erred by relying heavily on a state medical consultant's RFC assessment where there was no evidence the consultant was a physician).

Even if Pfleger were a physician, a review of his assessment provides

support for the ALJ's determination.  Pfleger's assessment found the overall medical evidence to not support Johnson's claims.  Additionally, Pfleger only recommended that Johnson avoid *concentrated* exposure to extreme cold and vibrations.  The ALJ's RFC determination that Johnson can perform the full range of light work is not contradictory.

There is no evidence that Pfleger was an acceptable medical source, and none of Johnson's treating physicians ever placed limitations on Johnson relating to vibrations or extreme cold.  Consequently, Johnson's final point fails.

The ALJ's determination that Johnson suffered no disability after June 19, 2006 is supported by substantial evidence in the record as a whole.  The decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.  A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of February, 2012